**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **THE LOUIS BERGER GROUP, INC.,** | Civil Action No.: 1:11-CV-00410-VM |
| *Plaintiff,* | |
| v. | |
| **STATE BANK OF INDIA**, | |
| *Defendant.* | |

**MEMORANDUM OF LAW OF DEFENDANT, THE LOUIS BERGER GROUP, INC.**
**IN OPPOSITION TO THE ORDER TO SHOW CAUSE**
**FILED BY PROGRESSIVE CONSTRUCTIONS LIMITED**

J CLARK & ASSOCIATES, LLC
John E. Clark, Esq. (JEC #8138)
20 Church Street, Suite 15
Montclair, N.J. 07042
(973)-707-5346
jclark@jclarkassociates.com

McCUSKER, ANSELMI, ROSEN & CARVELLI, P.C.
Paul G. McCusker, Esq. (PGM #7235)
210 Park Ave., Suite 301
Florham Park, N.J. 07932
(973) 635-6300
pmccusker@marc-law.com

Attorneys for Plaintiff, The Louis Berger Group, Inc.

## Table of Contents

TABLE OF CONTENTS.................................................................................2

TABLE OF AUTHORITIES ...........................................................................3

PRELIMINARY STATEMENT ......................................................................4

STATEMENT OF FACTS ..............................................................................8

LEGAL ARGUMENT

    I      PCL HAS SELECTED THE WRONG FORUM FOR AN INJUNCTION IN AID OF ARBITRATION. THE ONLY VENUE FOR THAT RELIEF IS THE STATE AND FEDERAL COURTS OF THE STATE OF NEW JERSEY ...............................................................................  19

    II     PCL DEMAND FOR INJUNCTIVE RELIEF SHOULD BE DENIED BECAUSE IT HAS FAILED TO MEET ITS BURDEN TO SHOW IRREPARABLE HARM AND LIKELIHOOD OF SUCCESS ON THE MERITS..........................................................................20

    III.    THE LETTER OF CREDIT IS INDEPENDENT OF THE CONSTRUCTION CONTRACTS. THEREFORE, THE DISPUTE OVER SBI-NY'S FAILURE TO PAY THE LETTER OF CREDIT SHOULD NOT BE JOINED WITH THE NEW JERSEY ARBITRATION OF CLAIMS FOR BREACH OF THE UNDERLYING CONSTRUCITON CONTRACT .......................................................................24

    IV.    ABSENT A SHOWING THAT LBG EITHER (1) PRESENTED FORGED OR FRAUDULENT DOCUMENTS, OR (2) ENGAGED IN AN EGREGIOUS FRAUD SO PERVASIVE THAT IT VIATIATED THE ENTIRE CONTRACTUAL RELATIONSHIP BETWEEN LBG AND PCL, THE SBI- NY LETTER OF CREDIT MUST BE PAID TO LBG..........................................................................26

CONCLUSION...............................................................................32

## Table of Authorities

Statutes

C.P.L.R. § 7502(c) .................................................................................................21

N.Y.U.C.C. § 5-103(d)............................................................................................26

N.Y.U.C.C. § 5-109 ................................................................................................29


Rules

*F.R.C.P. 65*..............................................................................................................21


Cases

*Roby v. Com. of Lloyd's,* 996 *F.*2d 1353, 1361 (2nd Cir. 1993) ..............................20

*Jockey Int'l, Inc. v. M/V "Leverkusen Express",* 217 *F.Supp.*2d 447, 455 (S.D.N.Y. 2002) ......................................................................................................................20

*QAI, Inc. v. Sprint Communs., Co.,* 120 *F.Supp.*2d 1218 (C.D. Cal. 2000) ...............20

*Boa v. Gruntal & Co.,* 942 *F.Supp.* 978, 983 (D.N.J. 1996) ...................................20

*American Express Fin. Adv. V. Thorley,* 147 *F.*3d 229, 231 (2nd Cir. 1998) ............21

*New York City Off-Track Betting Corp. v. New York Racing Ass'n,* 250 *A.*D.2d 437, 673 *N.Y.S.*2d 387, 390 (1st Dep't 1998) (New York C.P.L.R. § 7502(c).................21

*Tradition Chile Agentes De Valores Ltda v. ICAP Secs. USA LLC,* 2010 *U.S. Dist. LEXIS* 123673 (S.D.N.Y., Jan. 12, 2010) ..............................................................21

*Moore v. Consolidated Edison Co. of N.Y., Inc.,* 409 *F.*3d 506, 510 (2nd Cir. 2005)...............21

*Mazurek v. Armstrong,* 520 *U.S.* 968, 972, 117 *S.Ct.* 1865, 138 *L.Ed.2d* 162 (1997)...............21

*Ticor Title Ins. Co. v. Cohen,* 173 *F.*3d 63, 68 (2nd Cir. 1999) ......................20, 21

*Cavanaugh v. Looney,* 248 *U.S.* 453, 456, 39 *S.Ct.* 142, 63 *L.Ed.* 354 (1919)...........21

*Earth Web. Inc. v. Schlack,* 71 *F.Supp.*2d 299, 308 (S.D.N.Y. 1999) ........................22

*Bell & Howell v. Masel Supply Co.,* 719 *F.*2d 42, 45 (2nd Cir. 1983)........................22

*Register.com, Inc. v. Verio. Inc.,* 356 *F.*3d 393, 427 (2nd Cir. 2004)........................22

*JSG Trading Corp. v. Tray-Wrap. Inc.,* 917 *F.*2d 75, 79 (2nd Cir. 1990) ..................22

*Time Warner Cable. Inc. v. DirecTV. Inc.,* 497 *F.*3d 144, 153 (2nd Cir. 2007) .........22

*Brenntag International Chemical, Inc. v. Bank of India,* 175 *F.*3d 245, 249-250 (2nd Cir. 1999)............................................................................................................22

*City Commission on Human Rights v. Regal Gardens, Inc.,* 278 *N.Y.S.*2d 739, 742 (N.Y.Sup. 1967)....................................................................................................23

*Gerald Modell Inc. v. Morgenthau* 764 *N.Y.*S.2d 779, 784 (N.Y.Sup. 2003) ............................ 23

*Hyosung America, Inc. v. Sumagh Textile Co., Inc.*, 25 *F.Supp.*2d 376, 382 (S.D.N.Y. 1998).................................................................................................... 25, 30

*Alaska Textile Co. v. Chase Manhattan Bank, N.A.,* 982 *F.*2d 813, 815 (2d Cir. 1992) ........................................................................................................................ 25

*All Service Exportacao, Importacao Comercio, S.A. v. Banco Bamerindus Do Brazil, S.A., New York Branch,* 921 *F.*2d 32, 34 (2d Cir. 1990).................................... 25

*Mennen v. J.P. Morgan & Co.,* 91 *N.Y.*2d 13, 666 *N.Y.S.*2d 975, 979, 689 *N.E.*2d 869 (1997)............................................................................................................ 25

*First Commercial Bank v. Gotham Originals, Inc.,* 64 *N.Y.*2d 287, 486 *N.Y.S.*2d 715, 718, 475 *N.E.*2d 1255 (1985)..................................................................... 26

*Banco Nacional De Mexico, SA v. Societe Generale,* 34 *A.D.*3d 124, 129 (1st Dep. 2006.......................................................................................................... 26

*Banque Worms v. Banque Commerciale Privee*, 679 *F.Supp.* 1173, 1182 (S.D.N.Y. 1988) ....................................................................................................... 27

*Itek Corp. v. First National Bank of Boston*, 730 *F.*2d 19, 25 (1st Cir. 1984) ............................ 27

*New York Life Insurance Co. v. Hartford National Bank & Trust Co.*, 173 Conn. 492, 499, 378 *A.*2d 562, 566 (1977) ...................................................................... 27

*Ground Air Transfer, Inc. v. Weststates Airlines, Inc.*, 899 *F.*2d 1269 (1st Cir. 1990)......... 28, 29

*Aetna Life and Cas. Co. v. Huntingdon Nat'l Bank*, 934 *F.*2d 695 (6th Cir. 1991) .................... 28

*3Com Corp. v. Banco do Brasil*, 171 *F.*3d 739 (2nd Cir. 1999) *citing Recon/Optical*, 816 *F.*2d at 858 ................................................................................................ 29

*Roman Ceramics Corp. v. Peoples Nat'l Bank,* 714 *F.*2d 1207, 1214 (3d Cir. 1983) ............... 29

*Nostrum Laboratories, Inc. v. Martec USA, LLC,* 2009 *WL* 6318144 (N.Y. Supp. 2009) ...................................................................................................... 30

*Mid-America Tire, Inc. v. PTZ Trading, Ltd.*, 95 *Ohio.St.*3d 367, 374 & 390 *N.E.*2d 619, 626 & 639 (2002)........................................................................... 30

*Chiat/Day Inc. v Kalimian*, 105 *A.D.*2d 94 (1st Dep. 1984)........................................ 32

Other

*UCP Article 3(a)* ............................................................................................... 26

## PRELIMINARY STATEMENT

This matter is nothing more than a disingenuous effort by Progressive Constructions Limited ("PCL") – a multi-national company with hundreds of millions of dollars of annual revenue – to avoid the consequence of The Louis Berger Group, Inc.'s ("LBG") encashing standby letters of credit ("LC") secured by PCL as part of its contractual obligations. PCL seeks to have an injunction issued in order to preserve its right to a meaningful arbitration when the law of New York is clear that parties such as LBG are entitled to the LC monies pending arbitration. PCL tries to skirt its commitment with a fraud allegation pinned on rank hearsay, and a vague and unsubstantiated claim of irreparable injury. 's game plan is paradigmatic of its behavior that led to its default and should not be countenanced. The LCs are independent of the merits of the arbitration, are not subject to the arbitration, and should not be enjoined from encashment pending the arbitration.

PCL was a contractor under two construction contracts with LBG for the construction of two portions of a roadway between the cities of Juba and Nimule in Southern Sudan, Africa. The two contracts were to be performed simultaneously and all work was to be completed within eighteen months of a Notice to Commence issued by LBG on May 1, 2009. When PCL was expelled from the projects in November 2009 – more than six months later and 1/3 of the way through the allotted time - PCL had not yet completed mobilization of its personnel or material and had not completed any work on either of the two sections of the road. PCL had missed the deadline for virtually every milestone imposed by the contracts. The few workers PCL had on-site informed LBG that they were not being paid and that what equipment that had been delivered by PCL was inoperable due to lack of maintenance and spare parts. PCL never provided adequate manpower, equipment and facilities to even commence, much less complete,

the construction. In fact, within the first six weeks of the contract duration, PCL was already six weeks behind schedule.

Under the terms of the contracts, PCL was expressly required to provide LBG with performance security. One of the performance securities was in the form of the SBI-NY irrevocable standby LC. The contract required PCL to provide the LC by July 29, 2009. LC failed to provide the LC until October 1, 2009. Approximately four weeks after it received the SBI-NY LC, LBG expelled PCL from the projects.

In its application for an order to show cause, PCL essentially argues that, because LBG urged PCL to meet its pre-existing contractual obligation to provide performance guarantees, it was "fraud" for LBG not to excuse PCL's admitted prior and on-going breaches of the contract. It is important to note that PCL does not allege that the documents presented by LBG for payment of the SBI-NY LC were forged or fraudulent, and it does not allege that it was fraudulently induced into entering the construction contracts. Rather, PCL alleges that LBG committed fraud because LBG required PCL to meet a pre-existing contractual duty to provide performance security. Notifying a party that it is in breach of contract and demanding performance sufficient to cure its breach is simply not fraud. And, if PCL cured one material breach, but not another, LBG had the contractual right to expel PCL from the projects for the remaining breach. LBG denies that it ever promised PCL that PCL could continue in contumacious breach of contract so long as it provided performance guarantees or that the provision of performance guarantees would cure all of PCL's material breaches. Indeed, LBG expressly informed PCL that the failure to provide the performance guarantee was just one of several material breaches of the contract.

By its current application for a TRO and an injunction, PCL asks this Court to restrain LBG from encashing the letters of credit, and further asks that this matter be stayed pending the conclusion of the arbitration in New Jersey. PCL's showing by way of its instant application is wholly inadequate.

PCL's argument supporting the likelihood of success on the merits prong of this test hinges entirely on hearsay allegations by Mr. CH. S. Gopal that LBG's Vice President, Andy Bailey, fraudulently induced PCL to provide the letters of credit. Contrary to this incompetent evidence, Mr. Bailey, who actually attended the meeting which Mr. Gopal speculated about, submits a reliable and first hand declaration about what actually happened and what was said at the meeting. There was no fraud. This alone is sufficient for this Court to disregard Mr. Gopal's hearsay statement and find that PCL has not made an adequate showing of likelihood of success on the merits.

Similarly, PCL has not shown irreparable harm or any of the other elements required for a temporary restraining order. What PCL is attempting to do is to redefine the purpose of the performance security posted in accordance with the contract terms to guarantee PCL's "proper performance" under the contracts, to a guarantee akin to a bond securing a potential judgment against PCL in the underlying arbitration. The performance guaranteed was the construction of a highway. Had LBG bargained for security for a potential, future judgment, that agreement would have been memorialized in the contracts.

Mr. Gopal asserts without any support whatsoever that PCL would suffer financial consequences and hardship should LBG encash the letters of credit that LBG bargained for under the contracts. It is important to note that PCL is a company that certified to LBG that it had US $360 million in assets prior to commencing the contract. The letters of credit here amount to

approximately $7 million, or 2% of the value of PCL's assets. These facts are indeed difficult to reconcile with Mr. Gopal's protestations of financial hardship.

Finally, PCL has tried to use the Indian courts as an obstacle to encashment. It was only when an injunction from an Indian court was vacated on February 14, 2011 that the instant application was brought as a stop-gap measure. In light of an Indian appellate court's injunction issued on February 15, 2011 pending further review, it is not clear whether this Court has a ripe issue before it. Nevertheless, as stated previously, New York law is clear that such actions in foreign jurisdictions are not relevant to the LCs lest they be used to thwart these important instruments preserving the integrity of multi-national contracts sponsored by the United States Government. PCL should not be permitted to use multiple courts as part of its shell game to deny LBG the benefit of its bargain.

## STATEMENT OF FACTS

I, **ANDREW V. BAILEY, II,** declare under penalty of perjury under the laws of the United States of America as follows:

1.     I am the Senior Vice President of The Louis Berger Group, Inc. ("LBG") the Plaintiff in this matter. I make this Declaration based upon personal knowledge and submit it in opposition to the application by proposed Intervenor, Progressive Constructions Limited ("PCL") for an order to show cause and a temporary restraining order.

2.     In support of its application, PCL submitted a Declaration by Mr. CH. S. Gopal in which he inaccurately describes events concerning the project in Southern Sudan for USAID, that is at the center of this dispute, and further describes what he believes occurred at a meeting attended by PCL's Chairman, Mr. K.S. Rao and me in Washington, DC on September 18, 2009. Mr. Gopal was not present at that meeting.

3.     Reading Mr. Gopal's Declaration, one could conclude that LBG's expulsion of PCL from the site effectively terminating the Contracts was a surprise to PCL, and that the only reason for the expulsion was because PCL finally posted the contractually mandated performance security. This is not true. PCL's defaults under the Contracts (i) were long standing and legion, (ii) LBG provided numerous verbal and written notices to PCL of its performance deficiencies over the six month period that PCL was on the project, and (iii) under the terms of the Contracts, PCL's lack of performance warranted expulsion from the site.

4.     LBG and PCL entered into two Contracts for the construction of roads in Southern Sudan on April 30, 2009. The Contracts expressly call for PCL to post both a Mobilization Security and Performance Security. The Contract provides: "The Contractor shall provide a performance security for its proper performance of the Contract to the Employer after

receipt of the Letter of Acceptance. Provision of the Performance Security is a condition precedent to the submission of the initial interim Progress Payment." [COPA 10.1] The Letter of Acceptance, which is a part of the Contracts, is dated April 16, 2009.

5.      PCL submitted its first contractually-mandated work schedule to LBG on May 18, 2009. In that draft schedule, PCL showed it planned to commence mobilization on May 25, 2009, and complete all of the Works on August 15, 2010. The Contracts line items value for mobilization was $3.6 million. The Contracts called for the "initial interim Progress Payment" to be made by LBG after a portion of the Mobilization phase was completed. Therefore, PCL was obligated to submit the Mobilization and the Performance Security during the time between April 16, 2009 and the first payment request for mobilization, anticipated to be in June, but not later than the expiration of the Bid Bond (Security).

6.      PCL was contractually obligated to complete mobilization by July 29, 2009. COPA Sub-Clause 41.2 sets forth the requirements for mobilization. It says:

> The Contractor shall complete construction of all temporary facilities and mobilization of all key personnel, equipment and plant no later than ninety (90) calendar days after the Notice to Commence.
>
> No later than ten (10) calendar days after the Letter of Acceptance the Contractor shall submit a mobilization plan to "the Engineer" for his approval. The program shall include a Program noting the anticipated arrival of all construction equipment and the arrival of all key Contractor personnel and Subcontractors and the construction of temporary facilities.
>
> No later than fourteen (14) days after receipt of the Notice to Commence, the Contractor shall provide a layout plan noting the location, size and arrangement of all temporary facilities, including security fencing and entrance and exit gates, sewage and water lines and systems, electrical supply and access and facility roads.

7.     Mobilization work could commence prior to the acceptance of the detailed project schedule, and was required by the Contract to be completed by July 29, 2009. Not only was mobilization not completed by July 29, 2009, virtually no mobilization activities had commenced at all by that date, nor prior to the notice to PCL of its default.

8.     On July 11, 2009, approximately six weeks after contract signing, LBG's site project manager reported that PCL was believed to be six to eight weeks behind schedule with potential to fall further behind.

9.     By letter dated August 12, 2009 – fourteen days *after* the contractually-mandated mobilization *completion* date – LBG wrote to PCL noting that "[t]o date there has been no activity on site whatsoever" and that PCL was delinquent in providing Contract Performance Security and Mobilization Security, and further provided notice of the delinquencies to date of the key submittals and deliverables including:

    (a)     Preliminary Construction Schedule: 24 days late
    (b)     Cash Flow Estimate: 58 days late
    (c)     Delivery Forecast: 51 days late
    (d)     Staff Organization Chart: 59 days late delay
    (e)     Mobilization Plan: 75 days late
    (f)     Submittal Register: 71 days late
    (g)     Camp Layout Plan: 72 days late
    (h)     Contractor's Insurance: 43 days late
    (i)     Worker's Comp. Insurance: 69 days late

10.     LBG's August 12, 2009 letter also put PCL on notice that absent significant progress on the project, LBG would "have no choice but to recommend" the contractual remedy of expulsion. A true and accurate copy of LBG's August 12, 2009 letter is attached hereto as Exhibit A.

11.     On August 17, 2009, the Engineer, David Little, wrote to PCL expressing the Engineer's concerns about PCL's ability to "effectively get these projects underway and

successfully completed," and recounted PCL's assurances at a July 27, 2009 meeting that PCL would provide performance security by July 31, 2009, and mobilization security by August 15, 2009, and complete the Engineer's two camp site facilities by August 15, 2009 and August 25, 2009. The letter goes on to say: "I point out that the mobilization period for both sections expired on July 29, 2009 . . . and that all deadlines in (i) to (iii) have been missed with minimal work done on the Sec 2 campsite and nothing at all on Sec 1 campsite. As such, I can safely avow that PCL will not meet any of its promises regarding these matters." Mr. Little then expresses doubts held by both LBG and the client, USAID, about PCL's ability to "undertake these contracts successfully." Finally, Mr. Little closes his letter saying: "Show cause as to why the Employer should not recommend to USAID that the Contracts be terminated." A true and accurate copy of LBG's August 17, 2009 letter is attached as Exhibit B.

12.     By letter dated September 9, 2009, Mr. Little reported in detail to me that, in his opinion, PCL was in default under the Contracts. In addition to noting that PCL had not provided the contractually-mandated performance security, Mr. Little reported: "Today is day 132 of the Contract. The Contractor has made minimal progress to mobilize and indeed is now 42 days beyond the expiration of the mobilization period without having provided any facilities to the Engineer and very little for himself." A true and accurate copy of LBG's September 9, 2009 letter is attached hereto as Exhibit C.

13.     By letter dated September 10, 2009, I wrote to PCL's Chairman, Mr. Rao, providing a Notice to Cure under the Contracts for PCL's failure to post the required performance security. A true and accurate copy of LBG's September 10, 2009 letter is attached hereto as Exhibit D.

14.     By letter dated September 16, 2009, PCL finally responded to LBG's August 17, 2009 letter which demanded that PCL show cause why the Contracts should not be terminated. PCL's six page letter attempted to explain away PCL's many performance failures, and also contained a host of new commitments, including the submission of a "recovery schedule" and the performance security. With regard to the recovery schedule, PCL admitted that it was behind schedule and committed to submission of a recovery schedule saying: "Revised construction program (Clause 14.1 of GCC) will be submitted by 20th Sept, 2009 indicating how the time lost will be made up." PCL also explained the reason for its lateness in submitting the performance guarantees:

> Further, because of banking problems due to the general resistance from banks since project is in Sudan, the B[ank] G[uarantees] could not be arranged in time as would have been normally available in case of projects in other countries. More so because of exchange restrictions in Sudan, which in turn has resulted in delay in not only in obtaining the BGs but also in deployment of men and machineries.

PCL then made yet another promise of delivery of performance guarantees: "The Bank Guarantees for Performance Guarantees will be submitted by 30th Sept, 2009." At no time did PCL object to providing the performance security or the timeliness of providing it; on the contrary: each time that PCL was asked for the performance security, PCL always promised that it was forthcoming. A true and accurate copy of PCL's September 16, 2009 letter is attached hereto as Exhibit E.

### The September 18, 2009 Meeting

15.     On September 18, 2009, at my invitation, Mr. Rao traveled to Washington, DC and met with me at LBG's office to discuss PCL's now legion performance failures. My colleague, Martin Steinson, attended part of the meeting with Mr. Rao. Mr. Gopal was not present at the meeting. At the meeting, Mr. Rao engaged in a long discussion of his political

connections in India and his company's history. He further made vague and sweeping assurances that PCL could complete the project saying that PCL would devote the necessary assets to the project. His assurances did not contain any specific detail about how PCL was going to plan and complete the work which was by this time several months late. When I asked Mr. Rao what it would take to get the project completed on time, Mr. Rao responded that forty tipper trucks would be necessary, and then asked me if LBG would loan PCL $4 million to buy the trucks. I was quite surprised by this request and asked Mr. Rao to clarify it. He repeated that PCL needed the money to buy the trucks and reiterated his request for the $4 million loan. I told him emphatically that LBG would not make such a loan.

16.     Mr. Rao assured me in the meeting that the performance security would be provided shortly after the meeting. I told him that PCL's providing the performance security would cure one element of PCL's many defaults, but reiterated to Mr. Rao the litany of PCL's performance failures including its failure to mobilize, to build facilities for the Engineer's staff and for PCL's workers, and to have adequate equipment and resources at the site to commence work. I further repeated and made clear that PCL was in danger of default and termination.

17.     At the meeting Mr. Rao agreed to provide a recovery schedule which we discussed in some detail. Recovery schedules in the construction industry are detailed plans showing a schedule of work with resources – manpower, equipment, supplies, and material – factored in. Thus, a proper recovery schedule would show, for example, the makeup of the various construction crews from supervisors to laborers, the equipment they would operate, how that equipment would be operated and serviced, and the rate of progress that the multiple crews would accomplish during a schedule period. Mr. Rao promised that PCL would submit a

recovery schedule on September 20, 2009 to LBG showing how PCL planned to recover from

the delays caused by PCL to date complete the project on schedule.

18.     By letter dated September 22, 2009, I wrote again to PCL expressing both my

dissatisfaction with the meeting with Mr. Rao but also LBG's continuing concerns about PCL's

performance. I wrote:

> I appreciate your (September 16, 2009) letter and the visit of Mr. Rao, however, I
> remain concerned that PCL continues to demonstrate that is it unable to complete
> the two construction projects in accordance with the contract terms and
> conditions. Last week, virtually all productive efforts on the two camp locations
> stopped, with the explanation that there was no funding available to continue the
> work.

I also pointed out that the field review conducted by LBG during the past week revealed that

"several critical pieces of equipment were observed undergoing major overhaul and repair," and

that operational equipment did not have necessary fuel. I also pointed out to PCL that PCL had

not provided adequate staffing for the project, and that all delays to date had been caused by

"PCL's lack of personnel required to pursue the work," and asked for immediate submittal of the

now-late recovery schedule. Finally, I reminded PCL of the gravity of the PCL's performance

failures thus far, saying:

> We have repeatedly requested PCL to advise us what steps we can take to help
> you succeed in this work. To date the only suggestion we have is that we fund an
> additional forty tipper trucks in order to make up for lost time of production. This
> request certainly increased out concern over PCL's capability to provide the
> necessary resources to complete the project in accordance with the two contracts.
> While we desire that PCL successfully complete these contracts, we remained
> concerned and continue to examine every remedy available to us under the
> contract."

A true and accurate copy of LBG's September 22, 2009 letter is attached hereto as

Exhibit F.

19.     PCL's own workers had reported to LBG that they had not been paid and that they

had no money to purchase fuel, oil, tires and other consumables necessary to repair and to operate

what little equipment PCL had transported to the camps. PCL's own manpower estimates indicated that it would have over six hundred workers on site including nearly three hundred workers brought in from out of country. At no time before it was terminated did PCL ever have more than ninety workers on site.

20.     The Contract provided that PCL was to obtain Guarantees from banks located in the U.S.A. On September 25, 2009, PCL indicated that it had obtained a Performance Guarantee from a bank located in India. LBG advised PCL that, in accordance with the terms of the Contract, the proposed security was unacceptable.

21.     On September 23, 2009, PCL provided LBG with an incomplete copy of a guarantee from the State Bank of India, dated September 19, 2009, together with an accompanying cover letter from Punjab National Bank. Neither satisfied the minimum requirements for performance security specified by the Contract. On September 24, 2009, LBG received a letter from JP Morgan Chase, the proposed US correspondent bank of the Punjab National Bank. The letter contained the language of a Bank Guarantee from Punjab National Bank for $3,573,975 for Section 2 of Contract. However, the letter was prefaced by an instruction from JP Morgan Chase stating that as the financial instrument was a guarantee, and not a letter of credit, it would be unable to provide further assistance. Mr. Gopal's Declaration claims that PCL provided adequate performance security on September 27, 2009. This is incorrect.

22.     On September 24, 2009, LBG/Employer notified PCL that it had not provided Performance Security in accordance with the Contract and, as a result, the notice to cure remained in effect.

23.     On October 1 and October 6, 2009, PCL finally submitted two letters of credit as Performance Guarantees that were acceptable under the terms of the Contract.

24.     In his Declaration at paragraph 14, Mr. Gopal says that on October 20, 2009, the Engineer advised me that, in his opinion, PCL remained in default under the contract, and that "[n]one of the bases sited (sic) by the Engineer took into consideration the revised work program that Mr. Bailey promised would be used to evaluate PCL's ongoing performance." This is untrue. Upon receipt of PCL's "revised work plan" (a/k/a recovery plan) on October 12, 2009 (which PCL had promised to deliver twenty-two days earlier on September 20, 2009), LBG's on-site engineers evaluated the recovery plan and prepared a draft report. Among other things, LBG's investigation and evaluation revealed not only that the recovery plan was not workable, it did not even report the accurate count of equipment at the site. PCL's recovery plan said that there were thirty-nine pieces of "plant" (e.g., excavators, dozers, graders, trucks, compactors, etc.) at the site when, in fact, there were only eleven. In addition, PCL did not address how it was going to mobilize an additional one hundred sixty-two pieces of plant to the site, the capacity of critical crushers, or even how PCL planned to store/fuel and maintain this volume of equipment. PCL's manpower recovery plan was similarly deficient. It called not for a dramatic increase in manpower, but a decrease from four hundred eighty workers to four hundred ten. A true and accurate copy of LBG's draft report on PCL's recovery plan is attached hereto as Exhibit G.

25.     Contrary to Mr. Gopal's statement, LBG carefully evaluated PCL's recovery plan and found it wholly inadequate for its purpose: to demonstrate a plan that, if implemented, would get the project back on track and completed on schedule. The deficiencies in PCL's recovery plan compelled only one conclusion: PCL could not complete the project in accordance with the terms of the Contracts.

26.     On October 21, 2009, LBG confirmed by letter with a copy to PCL that PCL "is persistently and flagrantly neglecting to comply with its obligations under Sub Clause 46.1 (Rate of Progress) of the Conditions of Contract."

27.     Also on October 21, 2009, LBG wrote to PCL stating that it was terminating the Contract and informing PCL that its employees would be expelled from the camps after fourteen days.

28.     On or about November 4, 2009, when no work had been accomplished, approximately six months after the Contract was signed and PCL was authorized and directed to proceed with the Work, LBG had PCL's workers expelled from the camps. PCL's equipment was in such poor condition that much of it could not be immediately driven from the site.

29.     I understand that PCL has argued that the encashment by LBG of the two letters of credit in the approximate amount of $7 million would cause a series of defaults on other PCL projects and that PCL's lenders "are showing very tough restraint to issue any new security instruments on [PCL's] behalf." Gopal Declaration at ¶24. Within its prequalification package submitted by PCL when it was seeking permission to bid the project at issue in this dispute, PCL provided financial information to show its financial wherewithal to perform and finance this project. For the year 2007-2008, PCL certified to LBG that PCL had revenues of $253.6 million; earnings before interest and tax of $269.8 million; and total assets of $360 million. Based on these indicators of strong financial performance, LBG believed that PCL was financially solvent and more than capable of financing its operations on the project with its combined contracts value of $70 million, and posting letters of credit in the amount of $ 7 million – an amount less than two percent of the value of PCL's total assets. In reliance on this strong financial information, LBG entered into the contracts with PCL. A true and accurate copy of Information

Form 4(B) submitted by PCL in its Prequalification Package to LBG is attached hereto as Exhibit H.

30.    Since PCL's default and expulsion from the project, LBG has had to engage other contractors to construct the project. The cost of the replacement contractors' work is approximately $35 million more than LBG bargained for in its contracts with PCL.

/s/ Andrew V. Bailey, II

Dated: February 16, 2011                    by: _____
                                                    Andrew V. Bailey, II

*Please see the separately filed Declaration of Andrew V. Bailey, II, with exhibits annexed.*

**LEGAL ARGUMENT**

I.  **PCL HAS SELECTED THE WRONG FORUM FOR AN INJUNCTION IN AID OF ARBITRATION. THE ONLY VENUE FOR THAT RELIEF IS THE STATE AND FEDERAL COURTS OF THE STATE OF NEW JERSEY.**

PCL's application can be construed as a motion in aid of arbitration. Such a motion must be pursued in New Jersey. Conversely LBG must pursue its action against SBI-NY on the letters of credit in the Southern District of New York. The parties doe not dispute that the underlying construction contracts contain an arbitration clause, which requires all disputes arising out of those contracts to be arbitrated in New Jersey. Further, the parties do not dispute that the underlying construction contracts contain a choice of law clause and a forum selection clause, which require all construction contract disputes to be governed by New Jersey law and to be heard in the state and federal courts of the State of New Jersey. The Second Circuit has stated that there is a "strong public policy" in favor of enforcing forum selection clauses, *Roby v. Com. of Lloyd's,* 996 *F.*2d 1353, 1361 (2nd Cir. 1993), and that a waiver of a forum selection clause "should . . . not be found lightly." *Jockey Int'l, Inc. v. M/V "Leverkusen Express",* 217 *F.Supp.*2d 447, 455 (S.D.N.Y. 2002). Further, the construction contracts were not entered into in New York, were not performed in New York and neither LBG nor PCL maintains a principal place of business in New York. *See QAI, Inc. v. Sprint Communs., Co.*, 120 *F.Supp.*2d 1218 (C.D. Cal. 2000) (pursuant to the Federal Arbitration Act, 9 *U.S.C.* § 4, ***the proper venue for bringing an action for an injunction pending arbitration was in the district were the arbitration proceedings were occurring***.); *Boa v. Gruntal & Co.*, 942 *F.Supp.* 978, 983 (D.N.J. 1996) (Stating that where an arbitration is being conducted in New York "only a federal court sitting in New York may entertain [plaintiff's] application for injunctive relief."). Thus, this

Honorable Court does not have subject matter jurisdiction over the construction contracts. *See e.g., American Express Fin. Adv. V. Thorley*, 147 *F*.3d 229, 231 (2nd Cir. 1998) (a court of "competent jurisdiction" may hear a motion for an injunction in aid of arbitration). To the extent that PCL seeks to have this Honorable Court enter an injunction in aid of the arbitration of the construction contracts, it is respectfully submitted that the claim must be denied and that PCL must seek relief in the state or federal courts of the State of New Jersey.

II.   **PCL DEMAND FOR INJUNCTIVE RELIEF SHOULD BE DENIED BECAUSE IT HAS FAILED TO MEET ITS BURDEN TO SHOW IRREPARABLE HARM AND LIKELIHOOD OF SUCCESS ON THE MERITS**

An action for an injunction is governed by *F.R.C.P.* 65, which places the burden of proof on a movant to present competent evidence demonstrating irreparable injury and a likelihood of success on the merits. *See also New York City Off-Track Betting Corp. v. New York Racing Ass'n*, 250 *A*.D.2d 437, 673 *N.Y.S.*2d 387, 390 (1st Dep't 1998) (New York C.P.L.R. § 7502(c) permits injunctive relief in aid of arbitration "only upon the ground that the award to which the applicant may be entitled may be rendered ineffectual" in the absence of injunctive relief). In *Tradition Chile Agentes De Valores Ltda v. ICAP Secs. USA LLC*, 2010 *U.S. Dist. LEXIS* 123673 (S.D.N.Y., Jan. 12, 2010) a party sought a preliminary injunction pending arbitration, the Southern District of New York denied the application, stating:

> ***Preliminary injunctive relief is an extraordinary and drastic remedy which should not be routinely granted***. *See Moore v. Consolidated Edison Co. of N.Y., Inc.*, 409 *F*.3d 506, 510 (2nd Cir. 2005) (citing *Mazurek v. Armstrong*, 520 *U.S.* 968, 972, 117 *S.Ct.* 1865, 138 *L.Ed.2d* 162 (1997)). ***Rather, an injunction should be granted "when the intervention of a court of equity is essential to protect a party's property rights against injuries that would otherwise be irremediable."*** *Ticor Title Ins. Co. v. Cohen*, 173 *F*.3d 63, 68 (2nd Cir. 1999) (citing *Cavanaugh v. Looney*, 248 *U.S.* 453, 456, 39 *S.Ct.* 142, 63 *L.Ed.* 354 (1919)). ***Where legal remedies are inadequate to make a party whole, a movant may obtain injunctive***

*relief upon the showing of: "(1) irreparable harm or injury, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor of the movant*." *Earth Web. Inc. v. Schlack*, 71 *F.Supp*.2d 299, 308 (S.D.N.Y. 1999); *see also Ticor*, 173 *F*.3d at 68.

*Irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction*." *Bell & Howell v. Masel Supply Co*., 719 F.2d 42, 45 (2nd Cir. 1983). ***The mere possibility of harm is not sufficient; rather the harm must be real and imminent, and the movant must show that it is likely to suffer irreparable harm if equitable relief is denied***. *See Register.com, Inc. v. Verio. Inc*., 356 *F*.3d 393, 427 (2nd Cir. 2004) (citing *JSG Trading Corp. v. Tray-Wrap. Inc*., 917 *F*.2d 75, 79 (2nd Cir. 1990)). ***In this regard, a plaintiff must submit proof which provides a reasonable basis for believing there is an imminent injury***. *Time Warner Cable. Inc. v. DirecTV. Inc*., 497 *F*.3d 144, 153 (2nd Cir. 2007).

*Id.* (emphasis added). PCL is simply not entitled to the drastic remedy it now seeks.

The law is clear and well settled that an injunction should not issue where the moving will be made whole by money damages. *Brenntag International Chemical, Inc. v. Bank of India*, 175 *F*.3d 245, 249-250 (2nd Cir. 1999) ("As a general matter, because monetary injury can be estimated and compensated, the likelihood of such injury usually does not constitute irreparable harm."). The essence of PCL's claim is that LBG breached the construction contract and that therefore LBG is not entitled to the SBI-NY letter of credit. However, PCL acknowledges that LBG is a large company with adequate resources to compensate PCL should PCL prevail at arbitration. Thus, payment of the SBI-NY letter of credit to LBG is not irreparable harm.

In a transparent effort to confuse the relevant issues before the Court on this application - PCL improperly focuses on the parties' underlying construction contract dispute rather than on the letter of credit. To that end, PCL raises disputed and blatant hearsay allegations about: (a) statements made by LBG to PCL concerning PCL's provision of a letter of credit three months after it was initially due, and (b) PCL's financial condition. While these allegations are not

relevant to the SBI-NY letter of credit, LBG nevertheless is compelled to address them for the purposes of correcting the record.

Hearsay evidence is notoriously unreliable and courts generally decline to issue injunctions relying upon hearsay. *City Commission on Human Rights v. Regal Gardens, Inc.,* 278 *N.Y.S.*2d 739, 742 (N.Y.Sup. 1967) ("there must be something more before the Court than allegations upon information and belief before a temporary injunction may issue."); *see also Gerald Modell Inc. v. Morgenthau* 764 *N.Y.*S.2d 779, 784 (N.Y.Sup. 2003). In *Gerald Modell*, to obtain relief, the plaintiffs were required to demonstrate that the defendant was a "jewelry dealer." *Id.* The only evidence the plaintiffs submitted to establish that the defendant was a jewelry dealer were their own affidavits stating that he had told them he was. *Id.* The court held that the hearsay statements standing alone were insufficient to establishing that plaintiffs were likely to succeed on the merits because they would not demonstrate that the defendant was a "jewelry dealer." *Id.*

Here, PCL is heavily dependent on hearsay in its allegation that PCL was fraudulently induced into procuring the letters of credit. Specifically, Ch. S. Gopal's Statement provides:

> I am told that during that meeting Mr. Bailey assured Mr. Rao that LBG remained committed to the Agreements, and promised that LBG would fairly consider PCL's progress under a revised work program that would enable the project to be completed on schedule, provided that PCL deliver the performance security demanded in his Notices to Cure.

Gopal Statement at ¶9. This statement is clearly hearsay, and, is subject to even greater unreliability than regular hearsay because the declarant is totally unidentified. It is unclear whether this statement is double or triple hearsay. These hearsay statements by an unknown declarant are offered to prove the truth of the matter asserted, and are the sole basis for PCL's

claim for fraud. These hearsay statements standing alone are insufficient to show a likelihood of success on the merits.

In response to Mr. Gopal's hearsay statement concerning the September 18, 2009 meeting, LBG has presented the Declaration of Andrew Bailey who was present for the meeting at issue and who is competent to testify about what was said. See Bailey Dec. at ¶¶15-17. Mr. Bailey's recounting of the events is wholly different from the hearsay presented by Mr. Gopal and makes clear that there was no fraudulent inducement to provide the letters of credit.

Mr. Gopal's Statement also contains incompetent hearsay allegations concerning financial matters. In ¶24 of his Statement, Mr. Gopal asserts that "PCL's lenders are showing very tough restraint to issue any new security instruments". There is no indication that Mr. Gopal has personal knowledge of this self serving hearsay statement and there is no documentary or other evidence produced from a lender who has indicated that it will show "very tough restraint" when considering an application for a letter of credit made by PCL. Mr. Gopal asserts that PCL is in jeopardy of defaulting on its obligations to provide letters of credits to others because LBG has called the letter of credit in the instant action. Again, there is no evidence that Mr. Gopal has personal knowledge of this self serving statement and there is no documents or other evidence presented to indicate that any bank has refused to advance a letter of credit to PCL in other contracts due to the attempted encashment of the letter of credit in this action. Finally, Mr. Gopal asserts that PCL may be unable to continue as on ongoing concern if LBG is paid the letter of credit in this action. Again, there is no documentary evidence to support this self-serving assertion. In stark contract to the claims of financial difficulty now being advanced by PCL, PCL painted an entirely different picture when it was bidding to obtain the construction contracts from LBG. In the bid process, PCL provided LBG with certified financial statements in which PCL

swore that it had annual earnings of approximately US $270,000,000 and that it had assets of over US $360,000,000. See Bailey Dec. at ¶29. Thus, PCL either made a misrepresentation to LBG to induce LBG to enter into the construction contracts, or PCL has made a misrepresentation in Mr. Gopal's statement in order to obtain an injunction. In either event, the self-serving, hearsay and undocumented claim of financial difficulty made by PCL cannot provide the basis for an injunction.

### III.   THE LETTER OF CREDIT IS INDEPENDENT OF THE CONSTRUCTION CONTRACTS. THEREFORE, THE DISPUTE OVER SBI-NY'S FAILURE TO PAY THE LETTER OF CREDIT SHOULD NOT BE JOINED WITH THE NEW JERSEY ARBITRATION OF CLAIMS FOR BREACH OF THE UNDERLYING CONSTRUCITON CONTRACT

A standby letter of credit involves three separate, but related relationships: (1) the underlying contract between an employer and a contractor (here LBG and PCL); (2) the agreement between the issuing bank (SBI-NY) and the applicant (PCL); and (3) the standby letter of credit itself, which is the bank's (SBI-NY's) promise to pay the employer-beneficiary (LBG) upon compliance with the terms and conditions specified in the letter of credit. *Hyosung America, Inc. v. Sumagh Textile Co., Inc.*, 25 *F.Supp.*2d 376, 382 (S.D.N.Y. 1998); *Alaska Textile Co. v. Chase Manhattan Bank, N.A.,* 982 *F.*2d 813, 815 (2d Cir. 1992); *All Service Exportacao, Importacao Comercio, S.A. v. Banco Bamerindus Do Brazil, S.A.,* New York Branch, 921 *F.*2d 32, 34 (2d Cir. 1990); *Mennen v. J.P. Morgan & Co.,* 91 *N.Y.2d* 13, 666 *N.Y.S.*2d 975, 979, 689 *N.E.*2d 869 (1997). In *Alaska Textile, supra*, the court instructed that the utility of a letter of credit depends on the independence of these three relationships:

> The fundamental principle governing documentary letters of credit and the characteristic which gives them their international commercial utility and efficacy is that **the obligation of the issuing bank to honour a draft on a credit when it**

**is accompanied by documents which appear on their face to be in accordance with the terms and conditions of the credit is independent of the performance of the underlying contract for which the credit was issued**.

The "independence principle" stands for the proposition that any contract dispute between LBG and PCL for the construction contracts is wholly independent of SBI-NY's obligation to pay on the letter of credit. *First Commercial Bank v. Gotham Originals, Inc.,* 64 *N.Y.*2d 287, 486 *N.Y.S.*2d 715, 718, 475 *N.E.*2d 1255 (1985) (letters of credit "provide a quick, economic and predictable means of financing transactions," and their "utility rests heavily on strict adherence to the agreed terms and the doctrine of independent contract"); *UCP Article 3(a)* ("Credits, by their nature, are separate transactions from the sales or other contract(s) on which they may be based and banks are in no way concerned with or bound by such contract(s), even if any reference whatsoever to such contract(s) is included in the Credit."); *N.Y.U.C.C.* § 5-103(d) (McKinney 2005) ("Rights and obligations of an issuer to a beneficiary or a nominated person under a letter of credit are independent of the existence, performance, or nonperformance of a contract or arrangement out of which the letter of credit arises or which underlies it, including contracts or arrangements between the issuer and the applicant and between the applicant and the beneficiary.") . Here, PCL is improperly attempting to make payment of the letter of credit ***dependent*** upon the outcome of the arbitration. *See Banco Nacional De Mexico, SA v. Societe Generale*, 34 *A.D.*3d 124, 129 (1st Dep. 2006) ("The court further properly found that payment on the Letter [of Credit] was not conditioned on any 'arbitral award'"). PCL's request that this Honorable Court ignore the independence principle covering the SBI-NY letter of credit should be denied.

IV.   **ABSENT A SHOWING THAT LBG EITHER (1) PRESENTED FORGED OR FRAUDULENT DOCUMENTS, OR (2) ENGAGED IN AN EGREGIOUS FRAUD SO PERVASIVE THAT IT VIATIATED THE ENTIRE CONTRACTUAL RELATIONSHIP BETWEEN LBG AND PCL, THE SBI- NY LETTER OF CREDIT MUST BE PAID TO LBG.**

It is the exceptional case where a defense of fraud will relieve an issuing bank from its duty to pay against conforming documents in a letter of credit transaction. The one opposing payment has a duty to prove egregious, pervasive fraud in such a case, and here there was no fraud of any kind. A narrow exception to the issuing bank's obligation to honor complying documents is when the bank can prove that the documents are fraudulent. A dispute between the parties to the underlying commercial transaction does not create a fraud excusing payment by the issuing bank. While it is true that "[f]raud in the transaction represents a narrow exception to the independence principle." *Banque Worms v. Banque Commerciale Privee*, 679 *F.Supp.* 1173, 1182 (S.D.N.Y. 1988), [i]t is limited to situations in which the wrongdoing of the beneficiary has permeated the entire transaction ...; *Itek Corp. v. First National Bank of Boston*, 730 *F.*2d 19, 25 (1st Cir. 1984) (attempt to draw on standby when there was "no plausible or colorable basis under the contract" deemed fraudulent). The rationale behind limiting the fraud defense to only those cases in which the fraud permeates the entire transaction is "[i]f the letter of credit is to remain a viable tool of commerce, fraud in a collateral transaction cannot justify a refusal to pay" *Banque Worms v. Banque Commerciale Privee, supra.* "[O]ne of the expected advantages and essential purposes of a letter of credit is that the beneficiary will be able to rely on assured, prompt payment from a solvent party; necessarily, a part of this expectation of ready payment is that there will be a minimum of litigation and judicial interference, and this is one of the reasons for the value of the letter of credit device in financial transactions." *New York Life Insurance Co. v. Hartford National Bank & Trust Co.*, 173 *Conn.* 492, 499, 378 *A.*2d 562, 566 (1977).

In *Ground Air Transfer, Inc. v. Weststates Airlines, Inc.*, 899 *F*.2d 1269 (1st Cir. 1990), just as in this case, the applicant sought to enjoin the beneficiary from drawing, based on alleged fraud. The court refused to elevate the contract dispute to the level of fraud. The injunction was denied because the "[beneficiary's] position, in respect to the contract dispute, is not obviously without merit, ... its position is 'colorable,' and ... in arguing that it was entitled to receive [payment] and (not having received the money) to send a [default] letter, [beneficiary] is not acting 'fraudulently.'" *Id*. at 1271. The court pointed out that the beneficiary wants a standby letter of credit in the first place, to make certain that, should any contractual dispute arise, it will "wend [its] way towards resolution with the money in [his] pocket, rather than in the pocket" of his adversary ... **[T]o prevent the beneficiary from obtaining the money while the court decides the "underlying contract" question may deprive the beneficiary of the very benefit for which he bargained, namely that any such contract dispute will be "resolved while he is in possession of the money**." *Id*. at 1272. The court stated that injunctions are permitted only where there is:

> "fraud" so serious as to make it obviously pointless and unjust to permit the beneficiary to obtain the money. Where the circumstances "plainly" show that the underlying contract forbids the beneficiary to call a letter of credit ...; where they show that the contract deprives the beneficiary of even a "colorable" right to do so ...; where the contract and circumstances reveal that the beneficiary's demand for payment has "absolutely no basis in fact" ...; where the beneficiary's conduct has 'so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation would no longer be served ...'"

*Id*. at 1272-1273 (citations omitted).

In *Aetna Life and Cas. Co. v. Huntingdon Nat'l Bank*, 934 *F*.2d 695 (6th Cir. 1991) summary judgment was granted for the beneficiary because the issuer produced no evidence that beneficiary was guilty of intentional fraud. Apart from the burden of proof point, the Court of Appeals emphasized the independence of letters of credit from the underlying transaction and

stated:

> If an issuer could resist payment of drafts upon presentment by seeking to show irregularities of just any kind in the underlying transaction between its customer and the beneficiary, letters of credit would not be reliable as facilitating methods.

*Id.* at 702.

When a beneficiary (LBG) presents documents for the payment of a letter of credit claiming that the bank's customer (PCL) had breached the underlying contract, "dishonor is permissible only where the beneficiary's claim of breach is clearly untenable." *3Com Corp. v. Banco do Brasil*, 171 *F*.3d 739 (2nd Cir. 1999) *citing Recon/Optical,* 816 *F*.2d at 858 (draft not fraudulent because "whether or not [the beneficiary's] view of the merits of these disputes is correct, there is no evidence [of] bad faith"); *Ground Air Transfer, Inc. v. Westates Airlines, Inc.,* 899 *F*.2d 1269, 1272-73 (1st Cir. 1990) (draft not fraudulent because claim of default at least "colorable"); *Roman Ceramics Corp. v. Peoples Nat'l Bank,* 714 *F*.2d 1207, 1214 (3d Cir. 1983) (draft fraudulent where claim of nonpayment "has no basis in fact" and thus drawer "has no bona fide claim to payment at all"). In the matter *sub judice*, LBG declared PCL in breach of the underlying construction contract, when more than six months into an 18 month project PCL had not mobilized its people and material on site (a task that by contract was to be completed within the first 90 days) and had not begun any work on either of the two sections of roadway. PCL may dispute that it was in breach of contract – but that dispute does not give rise to a claim of fraud. If PCL believes that LBG is not entitled to the money due under the letter of credit, its relief is for money damages in the construction contract arbitration being conducted in New Jersey.

PCL correctly cites to the New York UCC § 5-109, for the proposition that a letter of credit can be enjoined from payment when: (1) there is a presentation of forged or fraudulent documents by the beneficiary, or (2) honor of the presentation would facilitate a material fraud

by the beneficiary. PCL then cites to the unpublished state court decision of *Nostrum Laboratories, Inc. v. Martec USA, LLC,* 2009 *WL* 6318144 (N.Y. Supp. 2009) in further support of this proposition. The *Nostrum* case dealt with a beneficiary's demand for payment of two letters of credit issued by Bank of India – New York where there had plainly been no breach of contract triggering the right for payment. The court granted the injunction finding that the party seeking the injunction was likely to succeed on the merits of its claim that there was no default and that the beneficiary's claim that it was "due" the amount of the LCs was false when made. Those facts are clearly distinguishable from the case at bar where there is no claim, and certainly no evidence, that the documents presented by LBG were false. Similarly, PCL cites to *Hyosung America, Inc. v. Sumagh Textile Co., Ltd*., 25 *F.Supp.*2d 376 (S.D.N.Y. 1998) for the proposition that an applicant claiming fraud can enjoin the payment of a letter of credit. In *Hyosung*, the court found that the beneficiary knowingly falsified documents and presented false documents for payment of the LC. *Id*. at 389. Thus, *Hyosung* is not on point. There is no claim, and no evidence presented, that LBG knowingly falsified any documents presented to SBI-NY.

PCL cites to a case decided by the Ohio state supreme court - *Mid-America Tire, Inc. v. PTZ Trading, Ltd*., 95 *Ohio.St.*3d 367, 374 & 390 *N.E.*2d 619, 626 & 639 (2002) **-** for the proposition that: "enjoining demand on a letter of credit were the beneficiary, a tire broker, induced the applicant to provide a letter of credit securing the purchase of less lucrative winter tires by falsely promising that it would sell the more lucrative summer tires if the letter of credit was tendered". The assertion made by PCL is incorrect. The Ohio court never ruled that payment of the letter of credit could be enjoined because there was fraud in the procurement of the letter of credit. Rather, the Ohio court ruled that payment of the letter of credit could be enjoined because there was a material fraud in the inducement to enter into the underlying contract to

purchase tires. *Id*. at 393 ("Keenly aware that appellants would not agree to purchase the winter tires without the summer tires, PTZ made, participated in, and/or failed to correct a series of materially fraudulent promises and representations regarding the more lucrative summer tires in order to induce appellants to commit to purchasing the winter tires….")

The *Mid America Tire* case stands for the proposition that in order to obtain an injunction against payment of a letter of credit, the movant must show "fraud that has so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation can no longer be served." *Id*. at 390-391. In the instant case, PCL presents no evidence that LBG fraudulently induced PCL into entering into the construction contracts.

PCL does not claim that the SBI-NY letter of credit should not be paid because LBG presented SBI-NY with fraudulent documents or that LBG fraudulently induced PCL to enter into the underlying construction contracts. Rather, PCL makes the novel argument that it was fraud for LBG to insist that PCL perform a pre-existing contractual duty to provide a letter of credit – which letter of credit PCL was contractually obligated to provide by no later than July 29, 2009 and which it had failed to provide by September 2009.

The construction contract documents demonstrate that PCL was required to provide the letters of credit (a "performance guarantee") to LBG by July 29, 2009. The contracts stated that PCL was to provide the performance guarantee between April 16, 2009 (the date of the Award Letter), and July 29, 2009 (the date for completion of mobilization and a milestone for the submission of a progress payment by PCL). The contracts further provided that a pre-condition for payment was the provision of the performance guarantee to LBG. PCL turns this precondition for payment on its head and argues that no performance guarantee was required until PCL made a request for a progress payment. PCL maintains that its own breach of the

contract excused it from providing the performance guarantee. That argument finds no support in the contract and it borders on the frivolous.

The construction contract documents required PCL to complete mobilization within 90 days of the May 1, 2009 Notice to Commence. PCL failed to meet this deadline. Indeed, six months into the project, and after numerous warnings from LBG that PCL was failing to meet required deadlines and that it appeared that PCL would not be able to complete the project on schedule, PCL had yet to complete mobilization of its personnel and equipment at the site. In sum, in September 2009 LBG threatened to expel PCL from the projects for PCL's failure: (1) to mobilize, (2) to begin the work and (3) to provide performance guarantees. PCL tendered the performance guarantee in September 2009. However, PCL did not complete mobilization or begin work. PCL was expelled from the project in November 2009 more than six months after the Notice to Commence. Further, in or about September 2009, PCL approached LBG and requested a $4,000,000 loan to buy dump trucks so that it could complete mobilization. Thus, even after PCL provided the letter of credit, it remained in material breach of contract and its own actions and words called into question its ability to timely complete the project. When distilled to its essence, PCL's claim is that since it had provided the performance guarantee – albeit three months after contract deadline for doing so – its other material breaches of the contract should have been excused. No matter how much PCL shouts "fraud", the facts reveal that its claim is merely one for breach of contract that does not preclude payment of the letter of credit by SBI-NY to LBG. *Chiat/Day Inc. v Kalimian*, 105 *A.D.*2d 94 (1st Dep. 1984) ("[T]he case law distinguishes between mere disputes about performance of a contract or breach of warranty and the active intentional fraud that rises to the level of fraud in the transaction.") If PCL believes that LBG is not entitled to the proceeds of the letter of credit, its sole remedy is to

seek money damages in the contract arbitration in New Jersey. However, the independence principle makes plain that LBG is entitled to the money without regard to any claim advanced by PCL that there is a construction contract dispute.

## <u>CONCLUSION</u>

It is respectfully submitted for the reasons set forth above, PCL is not entitled to a temporary injunction restraining payment of the SBI-NY letter of credit to LBG.


Attorneys for Plaintiffs, The Louis Berger Group, Inc.:

J CLARK & ASSOCIATES, LLC
20 Church Street, Suite 15
Montclair, N.J. 07042
(973)-707-5346
jclark@jclarkassociates.com

*/s/ John E. Clark*

By: John E. Clark, Esq.

*- and -*

McCUSKER, ANSELMI, ROSEN & CARVELLI, P.C.
210 Park Ave., Suite 301
Florham Park, N.J. 07932
(973) 635-6300
pmccusker@marc-law.com

*/s/ Paul G. McCusker*

By: Paul G. McCusker, Esq.


Dated: February 16, 2011