UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

THE LOUIS BERGER GROUP, INC.,

        *Plaintiff,*

v.

STATE BANK OF INDIA,

        *Defendant.*

Civil Action No.: 1:11-CV-00410-VM

DECLARATION OF
ANDREW V. BAILEY, II

---

I, **ANDREW V. BAILEY, II,** declare under penalty of perjury under the laws of the United States of America as follows:

1. I am the Senior Vice President of The Louis Berger Group, Inc. ("LBG") the Plaintiff in this matter. I make this Declaration based upon personal knowledge and submit it in opposition to the application by proposed Intervenor, Progressive Constructions Limited ("PCL") for an order to show cause and a temporary restraining order.

2. In support of its application, PCL submitted a Declaration by Mr. CH. S. Gopal in which he inaccurately describes events concerning the project in Southern Sudan for USAID, that is at the center of this dispute, and further describes what he believes occurred at a meeting attended by PCL's Chairman, Mr. K.S. Rao and me in Washington, DC on September 18, 2009. Mr. Gopal was not present at that meeting.

3. Reading Mr. Gopal's Declaration, one could conclude that LBG's expulsion of PCL from the site effectively terminating the Contracts was a surprise to PCL, and that the only

reason for the expulsion was because PCL finally posted the contractually mandated performance security. This is not true. PCL's defaults under the Contracts (i) were long standing and legion, (ii) LBG provided numerous verbal and written notices to PCL of its performance deficiencies over the six month period that PCL was on the project, and (iii) under the terms of the Contracts, PCL's lack of performance warranted expulsion from the site.

4. LBG and PCL entered into two Contracts for the construction of roads in Southern Sudan on April 30, 2009. The Contracts expressly call for PCL to post both a Mobilization Security and Performance Security. The Contract provides: "The Contractor shall provide a performance security for its proper performance of the Contract to the Employer after receipt of the Letter of Acceptance. Provision of the Performance Security is a condition precedent to the submission of the initial interim Progress Payment." [COPA 10.1] The Letter of Acceptance, which is a part of the Contracts, is dated April 16, 2009.

5. PCL submitted its first contractually-mandated work schedule to LBG on May 18, 2009. In that draft schedule, PCL showed it planned to commence mobilization on May 25, 2009, and complete all of the Works on August 15, 2010. The Contracts line items value for mobilization was $3.6 million. The Contracts called for the "initial interim Progress Payment" to be made by LBG after a portion of the Mobilization phase was completed. Therefore, PCL was obligated to submit the Mobilization and the Performance Security during the time between April 16, 2009 and the first payment request for mobilization, anticipated to be in June, but not later than the expiration of the Bid Bond (Security).

6. PCL was contractually obligated to complete mobilization by July 29, 2009. COPA Sub-Clause 41.2 sets forth the requirements for mobilization. It says:

> The Contractor shall complete construction of all temporary facilities and mobilization of all key personnel, equipment and plant no later than ninety (90) calendar days after the Notice to Commence.
>
> No later than ten (10) calendar days after the Letter of Acceptance the Contractor shall submit a mobilization plan to "the Engineer" for his approval. The program shall include a Program noting the anticipated arrival of all construction equipment and the arrival of all key Contractor personnel and Subcontractors and the construction of temporary facilities.
>
> No later than fourteen (14) days after receipt of the Notice to Commence, the Contractor shall provide a layout plan noting the location, size and arrangement of all temporary facilities, including security fencing and entrance and exit gates, sewage and water lines and systems, electrical supply and access and facility roads.

7. Mobilization work could commence prior to the acceptance of the detailed project schedule, and was required by the Contract to be completed by July 29, 2009. Not only was mobilization not completed by July 29, 2009, virtually no mobilization activities had commenced at all by that date, nor prior to the notice to PCL of its default.

8. On July 11, 2009, approximately six weeks after contract signing, LBG's site project manager reported that PCL was believed to be six to eight weeks behind schedule with potential to fall further behind.

9. By letter dated August 12, 2009 – fourteen days *after* the contractually-mandated mobilization *completion* date – LBG wrote to PCL noting that "[t]o date there has been no activity on site whatsoever" and that PCL was delinquent in providing Contract Performance Security and Mobilization Security, and further provided notice of the delinquencies to date of the key submittals and deliverables including:

    (a)    Preliminary Construction Schedule: 24 days late
    (b)    Cash Flow Estimate: 58 days late
    (c)    Delivery Forecast: 51 days late
    (d)    Staff Organization Chart: 59 days late delay

(e) Mobilization Plan: 75 days late
(f) Submittal Register: 71 days late
(g) Camp Layout Plan: 72 days late
(h) Contractor's Insurance: 43 days late
(i) Worker's Comp. Insurance: 69 days late

10. LBG's August 12, 2009 letter also put PCL on notice that absent significant progress on the project, LBG would "have no choice but to recommend" the contractual remedy of expulsion. A true and accurate copy of LBG's August 12, 2009 letter is attached hereto as Exhibit A.

11. On August 17, 2009, the Engineer, David Little, wrote to PCL expressing the Engineer's concerns about PCL's ability to "effectively get these projects underway and successfully completed," and recounted PCL's assurances at a July 27, 2009 meeting that PCL would provide performance security by July 31, 2009, and mobilization security by August 15, 2009, and complete the Engineer's two camp site facilities by August 15, 2009 and August 25, 2009. The letter goes on to say: "I point out that the mobilization period for both sections expired on July 29, 2009 . . . and that all deadlines in (i) to (iii) have been missed with minimal work done on the Sec 2 campsite and nothing at all on Sec 1 campsite. As such, I can safely avow that PCL will not meet any of its promises regarding these matters." Mr. Little then expresses doubts held by both LBG and the client, USAID, about PCL's ability to "undertake these contracts successfully." Finally, Mr. Little closes his letter saying: "Show cause as to why the Employer should not recommend to USAID that the Contracts be terminated." A true and accurate copy of LBG's August 17, 2009 letter is attached as Exhibit B.

12. By letter dated September 9, 2009, Mr. Little reported in detail to me that, in his opinion, PCL was in default under the Contracts. In addition to noting that PCL had not provided the contractually-mandated performance security, Mr. Little reported: "Today is day

132 of the Contract. The Contractor has made minimal progress to mobilize and indeed is now 42 days beyond the expiration of the mobilization period without having provided any facilities to the Engineer and very little for himself." A true and accurate copy of LBG's September 9, 2009 letter is attached hereto as Exhibit C.

13. By letter dated September 10, 2009, I wrote to PCL's Chairman, Mr. Rao, providing a Notice to Cure under the Contracts for PCL's failure to post the required performance security. A true and accurate copy of LBG's September 10, 2009 letter is attached hereto as Exhibit D.

14. By letter dated September 16, 2009, PCL finally responded to LBG's August 17, 2009 letter which demanded that PCL show cause why the Contracts should not be terminated. PCL's six page letter attempted to explain away PCL's many performance failures, and also contained a host of new commitments, including the submission of a "recovery schedule" and the performance security. With regard to the recovery schedule, PCL admitted that it was behind schedule and committed to submission of a recovery schedule saying: "Revised construction program (Clause 14.1 of GCC) will be submitted by 20th Sept, 2009 indicating how the time lost will be made up." PCL also explained the reason for its lateness in submitting the performance guarantees:

> Further, because of banking problems due to the general resistance from banks since project is in Sudan, the B[ank] G[uarantees] could not be arranged in time as would have been normally available in case of projects in other countries. More so because of exchange restrictions in Sudan, which in turn has resulted in delay in not only in obtaining the BGs but also in deployment of men and machineries.

PCL then made yet another promise of delivery of performance guarantees: "The Bank Guarantees for Performance Guarantees will be submitted by 30th Sept, 2009." At no time did PCL object to providing the performance security or the timeliness of providing it; on the

contrary: each time that PCL was asked for the performance security, PCL always promised that it was forthcoming. A true and accurate copy of PCL's September 16, 2009 letter is attached hereto as Exhibit E.

### *The September 18, 2009 Meeting*

15.  On September 18, 2009, at my invitation, Mr. Rao traveled to Washington, DC and met with me at LBG's office to discuss PCL's now legion performance failures. My colleague, Martin Steinson, attended part of the meeting with Mr. Rao. Mr. Gopal was not present at the meeting. At the meeting, Mr. Rao engaged in a long discussion of his political connections in India and his company's history. He further made vague and sweeping assurances that PCL could complete the project saying that PCL would devote the necessary assets to the project. His assurances did not contain any specific detail about how PCL was going to plan and complete the work which was by this time several months late. When I asked Mr. Rao what it would take to get the project completed on time, Mr. Rao responded that forty tipper trucks would be necessary, and then asked me if LBG would loan PCL $4 million to buy the trucks. I was quite surprised by this request and asked Mr. Rao to clarify it. He repeated that PCL needed the money to buy the trucks and reiterated his request for the $4 million loan. I told him emphatically that LBG would not make such a loan.

16.  Mr. Rao assured me in the meeting that the performance security would be provided shortly after the meeting. I told him that PCL's providing the performance security would cure one element of PCL's many defaults, but reiterated to Mr. Rao the litany of PCL's performance failures including its failure to mobilize, to build facilities for the Engineer's staff and for PCL's workers, and to have adequate equipment and resources at the site to commence work. I further repeated and made clear that PCL was in danger of default and termination.

17. At the meeting Mr. Rao agreed to provide a recovery schedule which we discussed in some detail. Recovery schedules in the construction industry are detailed plans showing a schedule of work with resources – manpower, equipment, supplies, and material – factored in. Thus, a proper recovery schedule would show, for example, the makeup of the various construction crews from supervisors to laborers, the equipment they would operate, how that equipment would be operated and serviced, and the rate of progress that the multiple crews would accomplish during a schedule period. Mr. Rao promised that PCL would submit a recovery schedule on September 20, 2009 to LBG showing how PCL planned to recover from the delays caused by PCL to date complete the project on schedule.

18. By letter dated September 22, 2009, I wrote again to PCL expressing both my dissatisfaction with the meeting with Mr. Rao but also LBG's continuing concerns about PCL's performance. I wrote:

> I appreciate your (September 16, 2009) letter and the visit of Mr. Rao, however, I remain concerned that PCL continues to demonstrate that is it unable to complete the two construction projects in accordance with the contract terms and conditions. Last week, virtually all productive efforts on the two camp locations stopped, with the explanation that there was no funding available to continue the work.

I also pointed out that the field review conducted by LBG during the past week revealed that "several critical pieces of equipment were observed undergoing major overhaul and repair," and that operational equipment did not have necessary fuel. I also pointed out to PCL that PCL had not provided adequate staffing for the project, and that all delays to date had been caused by "PCL's lack of personnel required to pursue the work," and asked for immediate submittal of the now-late recovery schedule. Finally, I reminded PCL of the gravity of the PCL's performance failures thus far, saying:

"We have repeatedly requested PCL to advise us what steps we can take to help you succeed in this work. To date the only suggestion we have is that we fund an additional forty tipper trucks in order to make up for lost time of production. This request certainly increased out concern over PCL's capability to provide the necessary resources to complete the project in accordance with the two contracts. While we desire that PCL successfully complete these contracts, we remained concerned and continue to examine every remedy available to us under the contract."

A true and accurate copy of LBG's September 22, 2009 letter is attached hereto as Exhibit F.

19.  PCL's own workers had reported to LBG that they had not been paid and that they had no money to purchase fuel, oil, tires and other consumables necessary to repair and to operate what little equipment PCL had transported to the camps. PCL's own manpower estimates indicated that it would have over six hundred workers on site including nearly three hundred workers brought in from out of country. At no time before it was terminated did PCL ever have more than ninety workers on site.

20.  The Contract provided that PCL was to obtain Guarantees from banks located in the U.S.A. On September 25, 2009, PCL indicated that it had obtained a Performance Guarantee from a bank located in India. LBG advised PCL that, in accordance with the terms of the Contract, the proposed security was unacceptable.

21.  On September 23, 2009, PCL provided LBG with an incomplete copy of a guarantee from the State Bank of India, dated September 19, 2009, together with an accompanying cover letter from Punjab National Bank. Neither satisfied the minimum requirements for performance security specified by the Contract. On September 24, 2009, LBG received a letter from JP Morgan Chase, the proposed US correspondent bank of the Punjab National Bank. The letter contained the language of a Bank Guarantee from Punjab National Bank for $3,573,975 for

Section 2 of Contract. However, the letter was prefaced by an instruction from JP Morgan Chase stating that as the financial instrument was a guarantee, and not a letter of credit, it would be unable to provide further assistance. Mr. Gopal's Declaration claims that PCL provided adequate performance security on September 27, 2009. This is incorrect.

22. On September 24, 2009, LBG/Employer notified PCL that it had not provided Performance Security in accordance with the Contract and, as a result, the notice to cure remained in effect.

23. On October 1 and October 6, 2009, PCL finally submitted two letters of credit as Performance Guarantees that were acceptable under the terms of the Contract.

24. In his Declaration at paragraph 14, Mr. Gopal says that on October 20, 2009, the Engineer advised me that, in his opinion, PCL remained in default under the contract, and that "[n]one of the bases sited (sic) by the Engineer took into consideration the revised work program that Mr. Bailey promised would be used to evaluate PCL's ongoing performance." This is untrue. Upon receipt of PCL's "revised work plan" (a/k/a recovery plan) on October 12, 2009 (which PCL had promised to deliver twenty-two days earlier on September 20, 2009), LBG's on-site engineers evaluated the recovery plan and prepared a draft report. Among other things, LBG's investigation and evaluation revealed not only that the recovery plan was not workable, it did not even report the accurate count of equipment at the site. PCL's recovery plan said that there were thirty-nine pieces of "plant" (e.g., excavators, dozers, graders, trucks, compactors, etc.) at the site when, in fact, there were only eleven. In addition, PCL did not address how it was going to mobilize an additional one hundred sixty-two pieces of plant to the site, the capacity of critical crushers, or even how PCL planned to store/fuel and maintain this volume of equipment. PCL's manpower recovery plan was similarly deficient. It called not for a dramatic

increase in manpower, but a decrease from four hundred eighty workers to four hundred ten. A true and accurate copy of LBG's draft report on PCL's recovery plan is attached hereto as Exhibit G.

25. Contrary to Mr. Gopal's statement, LBG carefully evaluated PCL's recovery plan and found it wholly inadequate for its purpose: to demonstrate a plan that, if implemented, would get the project back on track and completed on schedule. The deficiencies in PCL's recovery plan compelled only one conclusion: PCL could not complete the project in accordance with the terms of the Contracts.

26. On October 21, 2009, LBG confirmed by letter with a copy to PCL that PCL "is persistently and flagrantly neglecting to comply with its obligations under Sub Clause 46.1 (Rate of Progress) of the Conditions of Contract."

27. Also on October 21, 2009, LBG wrote to PCL stating that it was terminating the Contract and informing PCL that its employees would be expelled from the camps after fourteen days.

28. On or about November 4, 2009, when no work had been accomplished, approximately six months after the Contract was signed and PCL was authorized and directed to proceed with the Work, LBG had PCL's workers expelled from the camps. PCL's equipment was in such poor condition that much of it could not be immediately driven from the site.

29. I understand that PCL has argued that the encashment by LBG of the two letters of credit in the approximate amount of $7 million would cause a series of defaults on other PCL projects and that PCL's lenders "are showing very tough restraint to issue any new security instruments on [PCL's] behalf." Gopal Declaration at ¶24. Within its prequalification package submitted by PCL when it was seeking permission to bid the project at issue in this dispute, PCL

provided financial information to show its financial wherewithal to perform and finance this project. For the year 2007-2008, PCL certified to LBG that PCL had revenues of $253.6 million; earnings before interest and tax of $269.8 million; and total assets of $360 million. Based on these indicators of strong financial performance, LBG believed that PCL was financially solvent and more than capable of financing its operations on the project with its combined contracts value of $70 million, and posting letters of credit in the amount of $ 7 million – an amount less than two percent of the value of PCL's total assets. In reliance on this strong financial information, LBG entered into the contracts with PCL. A true and accurate copy of Information Form 4(B) submitted by PCL in its Prequalification Package to LBG is attached hereto as Exhibit H.

30. Since PCL's default and expulsion from the project, LBG has had to engage other contractors to construct the project. The cost of the replacement contractors' work is approximately $35 million more than LBG bargained for in its contracts with PCL.

Dated: February 16, 2011                    by: _____
                                                Andrew V. Bailey, II